UNITED STATES, Appellee

v

CARL L. CLOWER, JR., Lance Corporal, U. S. Marine Corps, Appellant

No: 27,410

March 29, 1974

*Lieutenant William Polkinghorn, Jr.,* JAGC, USNR, argued the cause for Appellant, Accused.

*Captain Daniel R. Remily,* USMCR, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel G. L. Bailey,* USMC.

## OPINION OF THE COURT

DUNCAN, Chief Judge:

Pursuant to his pleas, appellant was found guilty of two periods of unauthorized absence, in violation of Article 86, Uniform Code of Military Justice, 10 USC § 886. Additionally, although he pleaded not guilty to desertion but guilty to the lesser included offense of unauthorized absence, he was found guilty of desertion during a third period of absence between August 19, 1968 and March 14, 1972, by the members of his general court-martial. Appellant was sentenced to a dishonorable discharge, confinement at hard labor for 1 year, total forfeitures, and reduction to pay grade E-1. The convening authority ap-

proved the findings and sentence and deferred confinement pending appellate review. Subsequently, the U. S. Navy Court of Military Review reduced the sentence to a bad-conduct discharge and reduction to pay grade E-1, but otherwise approved the findings.

Appellant contends that the military judge, in his examination of the appellant concerning the alleged desertion, abandoned his role of impartiality and assumed a prosecutorial role. We agree.

## I

The Government's evidence offered to prove Clower's intent to desert was entirely documentary. Three days after charges against him resulting from two unauthorized absences were referred to trial he absented himself from Parris Island, South Carolina, without authority. According to his service records, his home was Decatur, Georgia. The appellant was married during his last absence in New Westminister, British Columbia. The military judge judicially noted that British Columbia was in a foreign country more than 3,000 miles from Parris Island.

The Government introduced in evidence a copy of a letter postmarked August 29, 1969, Vancouver, British Columbia, written by the appellant to his sister and brother-in-law in Georgia. Apparently a part of the letter was intended for his parents. This letter was damaging evidence tending to show appellant's intent permanently to remain away from the service. The letter stated, in part:

I'm sorry I left only for your sakes. I'll try to come home next summer for a visit. I only hope that I'll be able to do something to justify my leaving. *I'm planning to start an organization of the deserters here* (there are quite a few) in hopes that we'll be able to do some good.

.     .     .     .     .

I'm awfully sorry that I shot at people just because I was told to. That's what I'll have to get off my conscience, *not my desertion.*

I've been hopping from one job to the next and having a pretty hard go alto-gether. I was always scared and confused about what to do, but now I'm better.

*I'm going to immigrate legally now,* I hope. That's why I'm in Vancouver now.

Jeri [referring to his present wife who he indicated earlier in the letter had joined him in November 1968] is in Quesnel, B.C. *on a little place we're buying.* Its ten acres with a log cabin on it. We have electricity, but no running water. Its a peaceful, pretty place, though.

We have a baby girl now (Rhonda). Born on April 14th. . . .

.     .     .     .     .

Would you please send me my Birth Certificate and High School Diploma? I will need them to immigrate to Canada. (Emphasis added.)

The appellant enlisted for 4 years, and prior to May 1968 maintained a good record including a creditable tour of duty in Vietnam where he served in combat helicopters. He was awarded seven medals and awards including the Air Medal, some with two or three stars. Each of appellant's three absences was terminated by voluntary return to military control. Moreover, upon his last return because of his positive attitude he was released from confinement and restored to duty while awaiting trial. His first sergeant opined that appellant was in the top 10 or 15 Marines in performance in the company.

On direct examination, appellant stated that he never formed a specific intent to desert. He explained that he used the term desertion in the letter "more in the way civilians do" and that the "only intent I had was to form an intent of some kind." Appellant continued stating that he became confused and disillusioned in Vietnam. After he returned to the United States he found that he was still unable to determine whether his action in Vietnam was right or wrong. He testified, "so I left until such time as I could determine what in my mind was right, and what was wrong."

On cross-examination appellant acknowledged living in Canada for all but

4 months of his absence. He stated that his child was born in April 1969 and that he was married in Canada in March 1970. Earlier on direct examination, appellant had explained that he obtained immigrant status in Canada in April 1970 "because that was the only way I could legally stay up there," and that he did not return prior to surrendering in Charleston, South Carolina, because he had not resolved his moral confusion. On direct examination the appellant denied that immigrant status was equivalent to Canadian citizenship. Instead, he explained immigrant status is "like a working visa, a long term visa." Under cross-examination he acknowledged that he considered buying real property in Canada, and also considered organizing deserters.

At the close of the evidence the military judge solicited questions from the court members. They submitted two questions.[1] After the appellant answered the two questions, the military judge engaged him in the following colloquy:

Q. Lance Corporal CLOWER, there has been quite a bit of discussion about the moral conflict which you were trying to resolve. I take it, what you're talking about, is a conflict with morals, is that correct?
A. Yes, sir.

Q. Your own private morality has had some sort of difficulty matching up with society's and with the morality of everybody else? Is that right?
A. Yes, sir.

Q. Your own private morality didn't bother you with respect to leaving on unauthorized absence?
A. No, sir.

Q. Your own private morality didn't bother you by telling a lie to your parents about purchasing property?

DC: I'll have to object to that question. I'm not too clear as to what the lie was, that was told to his parents.

MJ: My recollection, in reading Prosecution Exhibit 5, is he indicates that he purchased a piece of property, now he's told us that he didn't. Isn't that correct?

DC: What does it say there, sir?

MJ: Let me refresh my recollection; but that was my recollection. "The little place we're buying. . . ."

ACCUSED: I think, what I meant there was, we are intending to buy.

MJ: In other words, you had not already bought it, nor had you ever undertaken to buy it.

ACCUSED: No, sir.

Q. Now, you also entered Canada illegally. Is that correct?
A. No, sir.

Q. You entered Canada legally?
A. Yes, sir.

Q. It's a question of staying there legally?
A. Yes, sir.

Q. You mentioned in response to two questions by the prosecution . . . a landed immigrant status, and a legally . . . the fact that you legally immigrated to Canada, all this had to, at least if my recollection serves me correctly, occur during April 1970. Is that correct?
A. Yes, sir.

Q. Now, does this . . . in response to your defense counsel question, this is a requisite to your staying legally?
A. Yes, sir.

Q. Is there anything that precludes your visa from being renewed periodically?
A. I couldn't answer that, sir, I don't know.

Q. Did you go with the visa initially?
A. No, sir.

Q. And, you went when, sometime in '68 or '69 or when?
A. Right at the end of '68.

Q. At the end of '68. And, your wife joined you . . . wife to be joined you in late '68 or early '69? Late '68?

---

[1] The first concerned the number of appellant's "helo" (helicopter) missions, and the second concerned whether he would carry out all new orders to a war zone today. The appellant answered that he flew 34, 35, somewhere in the mid-thirties. He also gave an affirmative answer to the second question.

A. Yes, sir.

Q. And, your child was born in '69?
A. Yes, sir.

Q. And, you were married when?
A. March 8, 1970.

Q. Did you have a visa . . . did your wife have a visa, or some . . . what do you need to go to Canada legally?
A. Nothing, sir.

Q. You just went up?
A. Yes, sir.

Q. So you had to put in for some sort of status to stay legally?
A. Yes, sir.

Q. What and when does this become a requirement or requisite?
A. It's . . . you can't hold a job legally up there without a visa. I don't believe you're suppose to stay there more than six months at a time without a visa.

Q. So actually there was a period of illegal residence in Canada. Is that correct?
A. Yes, sir.

Q. But, you legitimized subsequently with your legal immigration, and your landed immigrant status. Is that correct?
A. Yes, sir.

MJ: I don't believe I have any further questions. Either side have any questions based on my questions?

The role of impartiality of a military judge is particularly important in a close case such as this where the crucial issue is the appellant's intent to desert, and where defense success depends upon the acceptance of the truthfulness of appellant's testimony by the court members. " 'The influence of the trial judge on the jury is necessarily and properly of great weight,' Starr v United States, 153 US 614, and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word." Bollenbach v United States, 326 US 607, 612 (1946).

■ Although a military judge may question a witness to clarify or develop his testimony where it is necessary to aid the understanding of the court mem-

bers, the impression of partiality must not be created. United States v Marshall, 12 USCMA 117, 30 CMR 117 (1961); United States v Bishop, 11 USCMA 117, 28 CMR 341 (1960); United States v Grunberger, 431 F2d 1062 (2d Cir 1970). Under the circumstances of this case, it was unnecessary to clarify or further develop the testimony of the appellant. The examination of counsel was both thorough and incisive.

■ It is apparent that the manner of the military judge's questioning is akin to impeachment. His use of the phrase "your [appellant's] own private morality" reasonably provides a source for the inference that the judge disparaged appellant's concept of morality. The question posed to the appellant about his lying to his parents well communicates the military judge's belief that Clower was less than creditable. The examination also highlighted the fact that the appellant fathered a child out of wedlock, and questioned whether the appellant hadn't entered Canada illegally.

Common among jurors is the propensity to attempt to tune in on and adopt a trial judge's appraisal of the facts. At trial a judge is a positive authority figure symbolizing the very best of the legal profession's relation to the maintenance of justice. Extreme caution must be observed to prevent a joinder of an exposure of a trial judge's view of the facts and a juror's natural curiosity about an affinity for that view from causing any abandonment of each juror's personal factfinding responsibility.

■ Following this examination, the military judge instructed the court members, *inter alia,* to disregard any comment or statement made by him during the course of the trial which may have indicated an opinion as to the guilt or innocence of the accused. We do not find that a general cautionary instruction sufficiently ameliorated the impact of the military judge's examination to eliminate the inference of partiality.

In the instant case we believe that the error is plain and that our duty is to reverse the decision of the Court of Military Review. The finding of guilty of desertion is set aside. The record of trial is returned to the Judge Advocate Gen-

eral of the Navy. The case may be resubmitted to the United States Navy Court of Military Review which may affirm the lesser offense of unauthorized absence for the period alleged as desertion and reassess the sentence, or a rehearing may be ordered.

Judge QUINN and Senior Judge FERGUSON concur.